Iaffaldano v. Sun West. Good morning and may it please the court. Good morning. My name is Jeffrey Goland and along with my co-counsel at the council table, Ryan Grazzi, we represent the appellate Michalina Iaffaldano. This is very likely the first case involving the regulatory regime passed by Congress in 2010 and implemented by the Consumer Financial Protection Bureau in 2014 relating to the forced place insurance component of the Dodd-Frank regime. And as part of that regime, and as discussed in our papers, the Consumer Financial Protection Bureau imposes a duty pursuant to authority that was delegated to it by Congress on mortgage servicers to avoid forced placing insurance, which means replacing a borrower's insurance coverage with coverage procured. I'm going to cut to the chase. What injury has your client suffered? The insurance that she was charged cost her more money. Did she pay that money? She borrowed funds and paid the money. The loan was forgivable, but she did pay that money. In fact, it put her into a foreclosure. If she hadn't paid it, she would have lost her home. My understanding was that the state of Florida paid that money. The funds were provided in the form of a forgivable loan by the Florida Housing Finance Agency. So she undertook to either repay the loan or comply with the conditions that ultimately would have led to it being forgiven. Hasn't that loan been forgiven at this point? As of the date of trial, it had not been. Right. But what about today? Most likely it has been by now. However, the fact remains that she borrowed the money to pay for the insurance that she was charged against the law. I think if we look at situations where people may incur a debt and then ultimately be forgiven under that debt, we'd have to look at every consumer who ever filed a Chapter 7 bankruptcy and obtained a discharge. She incurred the liability and she complied with the conditions to resume. What I'm having a hard time with is the fact that she has literally today not a dime less in her pocket than she had before these acts that are the basis of the lawsuit. So I don't see how if she didn't have any damage, how either she wouldn't have standing or she wouldn't have the necessary predicate to arrest the claim in the first place. Why is that incorrect if she has not paid any money and now, since the loan has been forgiven, has no future requirement to pay any money? Well, it's not in the record that the loan has been forgiven, I would point that out. And I'm merely speculating that by now it likely has been. We're a year after the trial at this point. Furthermore, the funds that were made available to her were because she qualified for the assistance from the Florida Hardest-Hit Program. Presumably, if she were charged less money, and the amount of money that was made available to her through the program was finite, presumably if she had been charged less money, she could have gotten the same amount of funding from the Florida Hardest-Hit Program and could have used that for more years' worth of insurance coverage. We don't know that. That's not in the record. That wasn't what the district court based its opinion on. That wasn't what was charged. Let's assume, for sake of argument, you could have some private right of action here. What I was concerned about is she contends she had an escrow account by virtue of the 2013 repayment plan. Is that correct? Yes, Your Honor. That's correct. And if she doesn't have an escrow account, if there was never any escrow account, there would be no cause of action here, as I understand it. Is that correct? Yes. That is correct. So whether she's got damage, doesn't have damage, if she hasn't got an escrow account that violated Regulation X, okay, we have no claim. So to me, the 2013 repayment plan didn't create an escrow account and there is no evidence in this record of an escrow account. So I think your argument is there's an escrow account under the repayment plan. Is that what the argument was? Yes. Okay. Tell me how that creates an escrow account because it doesn't look like to me she ever had one with money set aside for taxes and insurance company. Your Honor. Are you following my work? I am following. Okay. I am following your discussion. When she got the Elmore funds, that was created well after you obtained the forced placement. Yes. Insurance. So that trust account could not trigger the obligation for the 2014 and 2015. They never contended that it did. Okay. Right. I am just saying, and that's good because I agree with that, but there was never any escrow account that she ever had under the repayment plan. Well, we would respectfully disagree with that. All right. Tell me how. Under 12 CFR 1024.17, the regulation defines what an escrow account is. And it says an escrow account means any account that a servicer establishes or controls on behalf of a borrower to pay taxes, insurance premiums, including flood insurance, and other related charges with respect to a federally related loan, including charges that the borrower and servicer have voluntarily agreed that the servicer should collect and pay. The definition encompasses any account established for this purpose, including a trust account, reserve account, impound account, or other term. But they never established an account under the repayment plan. What they did is they just required her to reimburse them for money it had already paid. You see, there was never escrow account or anything established for that. They just said, you've got to reimburse us for money they've already paid. They've already paid the taxes and insurance, correct? I would say that is incorrect because the regulation continues. Any, and quote, escrow account includes any arrangement where the servicer adds a portion of the borrower's payments to the principal and subsequently deducts from principal the disbursements for escrow items. The wording is awkward. But the insurance company paid those things out of their own funds. It did. Right. And then it added additional principal to her debt and ultimately sought foreclosure against the collateral property based on her failure to pay that. To that extent, it's the same thing in substance as a home equity loan. If a borrower takes out a home equity line against their home, they don't deposit any money into an account, and they don't necessarily receive any money unless they draw on that home equity line. When they do, that becomes a debt secured by the home. Here, the funds were advanced to pay for the taxes and insurance on the borrower's behalf, and she had agreed to repay it, and her failure to repay it triggered a foreclosure against the home. So there is no requirement under the ordinary sense of the word account that there be an actual deposit of money into any specific fund. Was her required payment a mortgage payment or some other kind of payment? It was a reverse mortgage. So there was no requirement to pay principal during her lifetime as long as she occupied the home. So why does she qualify under 12 CFR 1024.17 as a borrower whose mortgage payment is more than 30 days overdue? Was her mortgage payment ever 30 days overdue? The portion of the payment that led to the foreclosure, which was the funds advanced for the insurance as well as the taxes, was overdue. Is that a mortgage payment? That is a mortgage payment. It was secured by her home. I thought a moment ago you said it wasn't a mortgage payment. Did I misunderstand you? I believe you did, Your Honor. There is no obligation to make principal and interest payments on the initial amount taken when the loan was originated. The obligation for her to make payments during her lifetime arose because of the repayment plan agreement, and that portion of the debt that was covered by the repayment agreement the loan originated was an obligation that she had to make payments on. Let me ask you a question. What are we to make of the fact that SunWest introduced a disclosure form signed by your client indicating, quote, that she declined authorization for her lender to pay the property charges and agreed to pay those charges herself from her funds? Doesn't that basically answer the question? No, Your Honor. Why not? That happened at a point in time that was totally irrelevant. Why was it totally irrelevant? When the loan was originated, the regulatory regime wasn't in effect. The duty to maintain the forced place of insurance or maintain the voluntary coverage did not exist. The operative event that triggered the duty and the creation of the escrow account was the subsequent agreement which the repayment plan represents. So in 2013, I believe the loan was originated in 2009. In 2009, there was no escrow account. There was no Dodd-Frank, and there was no forced place insurance. When all of this comes into play is in 2014, which was only a few months after the 2013 repayment plan agreement. So in fact, anything that happened at origination is totally irrelevant to what this case is about. Why in a reverse mortgage situation would you create an escrow account anyway? There's certainly no monthly payments to be paid to the bank for interest, et cetera. Why would you in any event create an escrow account? It seems to me that escrow accounts have little utility in the reverse mortgage context. They make a whole lot of sense on the other end. But if that's the case, I'm just trying to find out whether there's any basis to establish clear error on the part of the district court who had a bench trial, made a finding of fact that you didn't put forth any evidence, quote, to establish that an escrow account actually existed in 2014 and 15. An escrow account is created under a reverse mortgage for the same reason it would be created under – Not to pay interest payments to the bank. No, but that's not what the escrow account is for. The purpose of the – So what's the purpose of the escrow account? In the reverse mortgage context. As defined in the regulation that I cited a moment ago, it is on behalf of the borrower to pay taxes and insurance premiums. That's why the escrow accounts exist. And they serve the same function in a reverse mortgage that they serve in a traditional mortgage. I think we've got it. You've reserved five minutes for your rebuttal. Thank you. May I please court? Scott Geiser on behalf of Apple East SunWest Mortgage – Can I ask you just a preliminary question? You may. There are two questions presented by this lawsuit. One, whether in fact there's an implied cause of action in the first place. And two, even assuming arguendo that there is, whether or not the district court clearly shared in your findings about the escrow account. Do we have to answer the first question here at all? Or can we simply assume for present purposes that there is an implied cause of action without finding that there is and simply go off on the second? Yes, you can. And I think based on the questions that I've heard from the panel, the panel will be in agreement that there is absolutely no evidence of an escrow account in this case. And certainly there was evidence to support the district court's finding that no escrow account existed. And when you look at the definition of an escrow account under Regulation X, it's fairly apparent that it's usually dealing with the forward market situation rather than the reverse market situation. And Judge Marcus, to answer your question about how it would play in a reverse mortgage setting, a reverse mortgage is based upon the equity that you have in your home and so you can then borrow against that. If you wanted to do what they call a set-aside account, which is what we put into place on Docket 155 that was denied, you can hold back some of that equity and put it aside and reserve it in an account where insurance and taxes will be paid out. But the bar were in this situation elected not to do that and take the full equity out in that situation and covered it R and R. But you might want an escrow account even in a reverse mortgage not to make the interest payments but simply to set aside a sum of money for the taxes and the insurance, right? Correct, and that's why Sunwest asked the question at the beginning of the relationship, do you want us to do that? And then she elected no and we put that form in as part of our appendix. So there was no – she tapped the full equity. She didn't want to hold back. And so it was her responsibility at that point in time to then make the taxes and insurance payments. The argument that the repayment plan created a escrow account, definitionally it doesn't make any sense. I mean if you read one, Judge Grant, you brought up the argument about if you're late by 30 days on your payment, well, there are no payments on a reverse mortgage. So that right there tells you what falls out of it. And then if you look at the language that the appellant italics in their brief, it includes any arrangement where the servicer adds a portion of the borrower's payments to principal, we don't have those payments. So you don't meet that first step and then subsequently deducts from the principal the disbursement items from escrow account. You don't have those deductions either because you don't have a payment. And the district court made that exact finding in her memorandum of opinion and said you don't have any evidence of that. And common sense would dictate that. If you think about it for a second, and it was admitted in the appellant's opening statement, if SunWest had not done anything in 2012, had it not renewed in 2012, it would have not violated any RESPA provision. There would be no claim here. But because SunWest actually took the positive act of advancing funds for its borrower that it had no obligation to do and then later asked for those funds to be paid back, now all of a sudden it's created a RESPA violation, that doesn't make sense that when a lender does something that it doesn't need to do for the benefit of a borrower that all of a sudden now it's suffering a penalty. I do want to address something that Judge Grant, you talked about with the Elmore funds because it was actually something that I thought about also when I was preparing for this last night. There's another issue about whether or not there's even any kind of relief that can be afforded by this court because the damages that were being sought, and it's in footnote 8 of the appellant brief, was the difference between the forced place insurance and what she would have been charged had there been a renewal. And there was a factual finding by the district court, and it's in paragraph 17 of her memorandum of opinion, where she says that the plaintiff failed to put on any evidence of that issue. She says that the evidence that they put in, which was the 2014 letter from the insurance broker, didn't state, while it stated an amount, didn't state what the terms of coverage were. And then the other piece of evidence was a 2016 policy that was completely different than the policy that the plaintiff had in the past. So the court said, you haven't even provided me with any evidence of damage, even if I was to find a violation. That was never appealed. That factual finding was not appealed. So even if you went in favor on everything that the plaintiff is asking for, you get back to the same issue of you still failed to prove damage, one, because you didn't put on any evidence of it, and then two, to Judge Grant's point, which is what we were raising, is you have this Elmore Fund issue of you got all your money back and your debt is going to be forgiven. I will address the issue of whether or not the claims that they're now seeking under 2065E and K were waived. The argument that was made as to 2605E was that, well, there was a motion to dismiss that involved 2065E, and so the matter was put forth. If you actually read the decision on the motion to amend by the district court, what the district court says, and this is on page 46 of the appellant's appendix, she says plaintiff's complaint was brought under 2605M, not 2605E. She then goes on and says she's requiring amendment only because it's unclear whether or not the submission of a qualified written request is a prerequisite to 2605M. Then the amendment happens, and again, it's still a cause of action of 2605M. It is not a cause of action under 2605E. Same issue with 2605K. I recognize that we had these discussions at the trial about the regulation X in this escrow account, but that was all in context of 1024.17, and one of the things that we argued at the trial court level that the district court ruled in our favor is that there is no private right of action under 1024.17. That finding by the trial court was not appealed either. What they're trying to do now is come around and use 2605K to bootstrap in 1024.17, but again, that was not an argument raised at appellate court. That wasn't part of the amended complaint. That is an argument that was also waived on appeal, and unless the court has any other questions for me, I have nothing further. Thanks very much. Thank you. Mr. Garland, you had the last word, and you've reserved five minutes. Counsel first represents that there was no evidence put on on damages. Well, he's reading from a portion of the opinion, the district court's memorandum opinion, that relates to a different claim and relates to a different period in time. In fact, there was evidence of what the insurance, had it been renewed, would have cost in 2014 and in 2015, and there was evidence of what it actually cost, and the district court didn't consider that evidence because it found the claim wasn't enforceable. Counsel also represents that the issue was waived. We would submit the issue was squarely presented in the pretrial stipulation. The issue of law, one of the issues of law that the pretrial stipulation framed was whether the implementing regulations following the Dodd-Frank enactment imposed the duty on the servicer to maintain the borrower's voluntary coverage and enforce. An issue of fact, and I agree that that is the overarching issue in this case, is whether under the definition set in 12 CFR 1024.17, the repayment plan agreement constitutes an escrow account. Okay, let's go back to the language he talked about that you highlighted, an arrangement where the servicer adds a portion of the borrower's payment to the principal. They didn't add the amount of the force insurance to the principal payments she was making each month because she wasn't making principal payments. Well, the language is... Is that correct? I don't believe it is, Your Honor. The language is awkward. However, it doesn't say monthly payments. It says the borrower's payments. And in this case, with the Elmore funds, she ultimately did pay the amount that was added. And of course... Well, but adds a portion of the borrower's, let's say, payment to principal. They didn't add it to the principal that she owed on the reverse mortgage. And that's why I say the language is awkward because payments, when you make a payment on a debt, the principal goes down. It doesn't go up. So the payment should be subtracted. It actually would make no sense to read that as saying that principal payments increase the balance of the debt. But more broadly, that's not the only language in this regulation that's on point here. More broadly, it says that an escrow account means any account that a servicer establishes to pay taxes. RESPA is a remedial statute. It is to be construed broadly in favor of the consumer protection objective behind the statute. The account that was created was a loan secured by the borrower's primary residence to pay for taxes and insurance. The memorandum opinion assumes that there has to be some sort of a cash deposit in order to create an escrow account. But nothing in the regulation establishes that, and that's not consistent with the common usage of the term account. When people take out a credit card, that's a credit card account. It has an account number, but there's no cash deposit. And what the repayment plan agreement was in substance, and in fact, it was a loan. It was a loan that was secured by the reverse mortgage. It was the borrower's initial failure to pay the principal on that loan that led to the filing of the foreclosure complaint and ultimately, when she did pay it, the foreclosure complaint was dismissed. Therefore, consistent with the language of the regulation, the funds that were used to pay for the force-placed insurance was additional principal that she ultimately did pay back. So there was a lot of focus, and I think it takes the relevant facts out of context. There was a lot of focus about whether or not she made payments. Ultimately, of course, she did make payments. And to construe this regulation in any other way would really be inconsistent with this court's opinions interpreting RESPA, including the most recent one, Renfro v. NationStar, where this court has consistently recognized that as a consumer protection statute and a remedial statute, the regulatory regime is to be construed broadly. If there's no other questions. Thank you very much. Thank you both. This court will be adjourned.